Filed 12/14/22  P. v. Wallquist CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B312263 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. A035045) |
| v. | |
| CARL G. WALLQUIST, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Chet L. Taylor, Judge.  Affirmed.

Robert Booher, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Charles S. Lee and Theresa A. Patterson, Deputy Attorneys General, for Plaintiff and Respondent.

Decades ago, Carl Wallquist pleaded guilty to murder and robbery. Thereafter, he filed a petition for resentencing under Penal Code[1] section 1172.6.[2] After an evidentiary hearing under that section, the trial court denied the petition, finding that Wallquist, who was not the actual killer, was a major participant who acted with reckless indifference to human life. Wallquist now appeals, contending that the trial court employed the wrong standard of review, the evidence was insufficient to show he acted with reckless indifference to human life, and his right to be present at the evidentiary hearing was denied. We reject these contentions and affirm the order.

## BACKGROUND

In 1987, Wallquist pleaded guilty to one count of first degree murder (§ 187, subd. (a)), three counts of residential robbery (§ 213.5), and one count of first degree burglary (§ 459). The trial court sentenced him to 25 years to life for the murder plus one year for an arming enhancement (§ 12022, subd. (a)).

Decades later, our Legislature passed Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437). In 2019, Wallquist petitioned for resentencing under the new law. The trial court appointed counsel for Wallquist, issued an order to show cause, and set the matter for an evidentiary hearing.

At the evidentiary hearing, the trial court considered the transcript from the 1986 preliminary hearing. At the

---

[1]    All further undesignated statutory references are to the Penal Code.
[2]    Effective June 30, 2022, section 1170.95 was renumbered to section 1172.6, with no change in text. (Stats. 2022, ch. 58, § 10.)

2

preliminary hearing, Elodia Torres[3] testified that on October 18, 1986, she was living in an apartment with her three children. Also present that morning at the apartment were Guadalupe Rubio, Pedro Torres (Elodia's brother), Alma Mendoza (Pedro's wife), and Jose Gutierrez. While in the bedroom with Gutierrez, Elodia heard the front door being kicked in. Wallquist, armed with a shotgun, and his accomplice Michael Odell, armed with a pistol, were in the apartment. At gunpoint, Wallquist ordered Elodia, who was holding her child, out of the bedroom. The armed men told Elodia and Gutierrez to go to the living room, where Rubio, Mendoza, and Pedro were face down on the floor. Elodia and Gutierrez also lay down. Wallquist was about two feet from Elodia. The men took money from Gutierrez's wallet, and Wallquist took Elodia's purse. After taking Pedro's wallet, Odell shot him while standing close to Pedro's head. Odell and Wallquist left shortly thereafter. Pedro died from his gunshot wound.

After he was arrested, Wallquist gave a statement to law enforcement.[4] He said that on the morning of the murder, he went to Odell's home where they planned to rob a dope house. Wallquist was "hurting" and needed drugs. Odell got the guns and they walked to the dope house.

Once there, Wallquist kicked the door three times, and when it didn't open, Odell helped him kick the door open. When

---

[3] We refer to some witnesses by their first names to avoid confusion, intending no disrespect.

[4] Defense counsel agreed that the trial court could consider this statement for the purposes of the evidentiary hearing on the petition. Odell had also given a statement to law enforcement, but the trial court did not consider it.

the people inside ran, Wallquist and Odell made them return to the living room and lie on the floor. Odell began acting "crazy" and made people from the bedroom come and lie on the floor too. Wallquist just wanted heroin, but Odell wanted the purses. Wallquist was near the door, and Odell was by the kitchen when the gun went off. Odell took a purse, and Wallquist took a wallet from the dead man and cash from Gutierrez. They also took gold and jewelry. After the shooting, they grabbed the loot and left, netting about $500 in cash, which they split. Odell kept the gold they stole. Wallquist said he had known there would be no "gun play" from the apartment's occupants, so he thought it would be a pretty safe robbery.

In its written decision, the trial court said it relied only on Wallquist's statement and the preliminary hearing transcript. Based on them, the trial court found that Wallquist was a major participant who acted with reckless indifference to human life, under *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*). After restating the facts, the trial court first found that Wallquist was a major participant who had helped plan to rob what he thought was a dope house, arming himself to do so. Similarly, Wallquist acted with reckless indifference to human life because he armed himself with a shotgun, was physically present, and clearly indicated he was there to assist and support Odell. Although it was unclear how long the incident lasted, the duration was long enough to have all the people moved to one room and their personal property removed. Although there was no evidence Wallquist knew before the robberies that there was a likelihood Odell would shoot someone, Wallquist did nothing to minimize the risk of violence and did not assist Pedro after he was shot.

4

# DISCUSSION

I.      Overview of section 1437 and standard of review

Senate Bill 1437, which took effect on January 1, 2019, limited accomplice liability under the felony-murder rule and eliminated the natural and probable consequences doctrine as it relates to murder, to the end of ensuring that a person's sentence is commensurate with the person's individual criminal culpability. (*People v. Gentile* (2020) 10 Cal.5th 830, 842–843.) As relevant here, Senate Bill 1437 amended the felony-murder rule by adding section 189, subdivision (e), which provides that a participant in the perpetration of qualifying felonies is liable for felony murder only if the person: (1) was the actual killer; (2) was not the actual killer but, with the intent to kill, acted as a direct aider and abettor; or (3) the person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in section 190.2, subdivision (d). (*Gentile*, at p. 842.)

Senate Bill 1437 also added section 1172.6, which created a procedure whereby persons convicted of murder under a now-invalid felony-murder theory may petition for vacation of their convictions and resentencing. A defendant is eligible for relief under section 1172.6 if the defendant meets three conditions: (1) the defendant must have been charged with murder under a theory of felony murder, (2) must have been convicted of first or second degree murder, and (3) could no longer be convicted of first or second degree murder due to changes to sections 188 and 189 effectuated by Senate Bill 1437. (§ 1172.6, subd. (a).) If a petitioner makes a prima facie showing of entitlement to relief, the trial court shall issue an order to show cause (§ 1172.6, subd. (c)) and hold an evidentiary hearing at which the

5

prosecution bears the burden of proving "beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder" under the law as amended by Senate Bill 1437 (§ 1172.6, subd. (d)(3)).  The parties may offer new or additional evidence at the evidentiary hearing.  (*Ibid.*)  A "finding that there is substantial evidence to support a conviction for murder" is insufficient to meet this required showing.  (*Ibid.*)  The trial court sits as an independent factfinder to determine beyond a reasonable doubt whether the defendant is guilty of murder under a valid theory of murder.  (*People v. Garrison* (2021) 73 Cal.App.5th 735, 745.)

On appeal, we review the trial court's findings for substantial evidence.  (*People v. Clements* (2022) 75 Cal.App.5th 276, 298; accord, *People v. Mitchell* (2022) 81 Cal.App.5th 575, 591.)  Under that standard of review we " ' "examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt." ' " (*Clements*, at p. 298.)  We presume in support of the judgment the existence of every fact that can be reasonably deduced from the evidence.  (*People v. Owens* (2022) 78 Cal.App.5th 1015, 1022.)

Although Wallquist acknowledges this authority that our review is for sufficiency of the evidence, he urges us to conduct an independent review, suggesting that we are as in just as good a position as the trial court to review a "cold record," referring to a proceeding where no live testimony was offered.  *People v. Clements*, *supra*, 75 Cal.App.5th at page 301, rejected this same argument because the inquiry on a section 1172.6 petition is

6

primarily a factual one, especially where the issue, as here, is whether the petitioner acted with reckless indifference to human life. *Clements* also found the defendant's reliance on *People v. Vivar* (2021) 11 Cal.5th 510, on which Wallquist also relies, unpersuasive. *Vivar* concerned section 1437.7, under which courts may vacate a conviction if a defendant shows by a preponderance of the evidence a prejudicial error affecting the defendant's ability to meaningfully understand the immigration consequences of a plea. *Vivar*, at page 524, emphasized that while the inquiry whether counsel's immigration advice was inadequate and prejudicial involved mixed questions, the inquiry was predominately one of law. As such, independent review on appeal was proper. The court further noted that its decision applied only to section 1437.7, and nothing it said otherwise "disturbs a familiar postulate" that review under the substantial evidence standard requires appellate deference to the trial court's factual findings regardless of whether they are based on oral testimony or declarations. (*Vivar*, at p. 528, fn. 7.)

We agree with *Clements* and disagree that *Vivar* speaks to what standard of review we should apply on a section 1172.6 appeal. In any event, even if we independently reviewed this matter, the outcome would be no different.

II. Trial court did not employ a substantial evidence standard

In addition to urging us to use independent review, Wallquist argues that the trial court used the wrong standard of review, requiring remand. (See generally *People v. Lua* (2017) 10 Cal.App.5th 1004, 1021 [record was ambiguous whether trial court knew it had discretion to strike an enhancement, so remand proper to consider matter under correct standard].) That is, instead of determining whether the prosecution met its burden of

7

proving murder beyond a reasonable doubt as section 1172.6, subdivision (d)(3) requires, the trial court merely determined whether there was sufficient evidence Wallquist met the *Banks/Clark* factors. In making this argument, Wallquist points out that at the end of its written decision, the trial court said: "Unlike the defendants in *Banks* and *Clark* who were able to have their special circumstances vacated because they were not wielding guns themselves and also not present for shootings because they were acting as get-away drivers or because they were involved in the planning of the crimes only*, substantial evidence* supports the conclusion that [Wallquist] was a major participant and acted with reckless indifference to human life." (Italics added.)

This brief reference to "substantial evidence" does not persuade us that the trial court misapprehended its duty, especially when considered in the context of the entire written decision and the hearing. At the outset of its written decision, the trial court said that the People "have met their burden of showing *beyond a reasonable doubt* that" Wallquist could now be convicted of murder under the current law. (Italics added.) Later, the trial court referred to the *Clark* factors and said that "the evidence shows *beyond a reasonable doubt* that" Wallquist acted with reckless indifference to human life. (Italics added.)

Similarly, at the hearing, the trial court showed its understanding of the burdens, noting that the People had to "show beyond a reasonable doubt that the petitioner is ineligible for relief." Other comments the trial court made demonstrate it employed the correct standard; for example, the trial court asked counsel whether it could consider a prior robbery Wallquist had committed in which he used a fake gun, but the store owner had

8

a real gun and shot Wallquist and his accomplice. To the trial court, this showed Wallquist's state of mind during the current crime: Wallquist had learned from his prior mistake, so this time he used a real gun. The trial court repeatedly said it had to determine Wallquist's state of mind, saying at one point, "I think the court should be able to look at all those factors to be able to make that determination. Your client was not a virgin to committing crimes and, in particular, committing robberies involving handguns or shotguns." These statements show that the trial court understood its role as an independent factfinder who had to find beyond a reasonable doubt that Wallquist had the requisite mental state for murder.

III.    Sufficiency of the evidence that Wallquist was a major participant who acted with reckless indifference to human life

Next, Wallquist contends that the trial court erred by denying his section 1172.6 petition because there was insufficient evidence to support its conclusion that he acted with reckless indifference to human life. We disagree.

   A. *What it means to be a major participant who acts with reckless indifference to human life*

This area of law regarding what it means to be a major participant in a crime who acts with reckless indifference to human life has its genesis in two United States Supreme Court cases: *Enmund v. Florida* (1982) 458 U.S. 782 and *Tison v. Arizona* (1987) 481 U.S. 137. *Enmund* held that the death penalty could not constitutionally be imposed on an armed robbery getaway driver who was a minor participant in the crime,

9

was not present when the murder was committed, and had no intent to kill. (*Enmund*, at pp. 798, 801.)

In contrast, *Tison v. Arizona*, *supra*, 481 U.S. at page 139, did not preclude imposing the death penalty for two defendants, brothers, who had helped their father and his cellmate—both convicted murderers—escape from prison. The defendants gave them guns, and the group later kidnapped a family of four. The defendants then stood by while their father debated whether to kill the family and proceeded to shoot the family, including a toddler and a teenager. (*Id.* at pp. 139–141.) The court held that the Eighth Amendment does not prohibit imposing the death penalty on a nonkiller who lacked the intent to kill, but whose "participation [in the crime] is major and whose mental state is one of reckless indifference to the value of human life." (*Id.* at p. 152; see also *id.* at pp. 157–158.)

Years later, in *Banks* and *Clark*, our Supreme Court addressed *Enmund* and *Tison* and substantially clarified the "major participant" and "reckless indifference to human life" requirements. *Banks*, *supra*, 61 Cal.4th at page 794, considered "under what circumstances an accomplice who lacks the intent to kill may qualify as a major participant." The court listed various factors that should be considered in making that determination: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a

particular role in the death?  What did the defendant do after lethal force was used?"  (*Id.* at p. 803, fn. omitted.)

The court then turned its attention to "reckless indifference to human life" in *Clark*.  Reckless indifference to human life is " 'implicit in knowingly engaging in criminal activities known to carry a grave risk of death.' "  (*Clark*, *supra*, 63 Cal.4th at p. 616.) It "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*Id.* at p. 617.)  Recklessness has both a subjective and an objective component.  (*Ibid.*)  Subjectively, the defendant must consciously disregard risks known to him.  Objectively, recklessness is determined by "what 'a law-abiding person would observe in the actor's situation,' " that is, whether defendant's conduct " 'involved a gross deviation from the standard of conduct that a law-abiding person in the actor's situation would observe.' "  (*Ibid.*)

*Clark* listed factors to consider when determining whether reckless indifference existed:  "Did the defendant use or know that a gun would be used during the felony?  How many weapons were ultimately used?  Was the defendant physically present at the crime?  Did he or she have the opportunity to restrain the crime or aid the victim?  What was the duration of the interaction between the perpetrators of the felony and the victims?  What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force?   What efforts did the defendant make to minimize the risks of violence during the felony?"  (*In re Scoggins* (2020) 9 Cal.5th 667, 677 [summarizing *Clark* factors].)

11

At the evidentiary hearing below, Wallquist's trial counsel conceded Wallquist was a major participant. On appeal, Wallquist does not directly address whether he was a major participant in the crime and instead focuses on whether he acted with reckless indifference to human life. Accordingly, we treat the major participant prong of the inquiry as conceded and focus on whether there was sufficient evidence Wallquist acted with reckless indifference to human life.

B. *Reckless indifference to human life*

Cognizant that the *Bank/Clark* factors overlap, we begin with whether Wallquist knew that a gun would be used during the felony. There is no dispute that he and Odell planned the felony and armed themselves, although Wallquist said it was Odell who procured the guns. Although the mere fact that Wallquist knew guns would be used is insufficient by itself to establish reckless indifference to human life (see, e.g., *Clark*, *supra*, 63 Cal.4th at p. 617), Wallquist actively used his gun to threaten and keep the victims at bay. Elodia testified that Wallquist ordered her at gunpoint out of the bedroom while she was holding her child. Such use of his gun enabled the murder and exhibited reckless indifference to human life. (See, e.g., *People v. Bascomb* (2020) 55 Cal.App.5th 1077, 1089 [defendant used his gun to threaten and keep victims at bay, thereby actively enabling the murder and exhibiting reckless indifference].)

As for what Wallquist knew about any propensity for violence Odell might have had, there is no evidence on this factor. (Compare *In re Miller* (2017) 14 Cal.App.5th 960, 976 [although defendant and killer belonged to same gang and had committed follow-home robberies together, no evidence they had participated

12

in shootings, murder, or attempted murder].)  However, *during* the robberies, Odell began acting crazy.  Thus, there was evidence that Wallquist had cause for concern that his accomplice was not sticking to any plan for a "safe" robbery but disregarded that concern.

The next factor we examine is the crime's duration, because there is generally a greater opportunity for violence when a victim is held at gunpoint or restrained for prolonged periods. (*Clark*, *supra*, 63 Cal.4th at p. 620.)  It is unclear how long the event here lasted.  But, as the trial court observed, it was long enough for Wallquist and Odell to violently kick in a door; round up the eight people in the apartment; move Elodia, Gutierrez, and Elodia's child from the bedroom to the living room; and take the victims' purses, wallets, cash, jewelry, and gold.  Throughout this time, Wallquist and Odell held the victims at gunpoint.  Also, even though Wallquist said that he knew the apartment's occupants would not fight back, he nonetheless knew that people would be at the apartment.  That the defendants were armed in the presence of eight people, three of whom were children, heightened the risk of violence.  (See, e.g., *People v. Owens*, *supra*, 78 Cal.App.5th at p. 1024 [bank robbery posed high risk of violence because it occurred during business hours with 20 people present and robbers were armed].)

Although this factor supports the trial court's finding, Wallquist argues that having the victims lie face down on the floor minimized the risk of violence.  At least one court rejected a similar argument.  *People v. Bascomb*, *supra*, 55 Cal.App.5th 1077, involved similar facts, where the armed defendants rushed the apartment door and forced the occupants to the floor.  The appellate court observed that the "primary purpose of this threat

was to enable the robbery, not avoid violence." (*Id.* at p. 1090.) Thus, while the defendant may not have intended for his accomplice to use his gun, the manner in which they carried out the robbery was "sufficiently weighty" to support the trial court's reckless indifference finding. (*Ibid.*)

Next, the defendant's presence at the murder is a particularly important aspect of the inquiry. (See, e.g., *People v. Garcia* (2020) 46 Cal.App.5th 123, 148.) Defendants who were not at the crime scene have been more likely to be found not to have the requisite mental state. Even so, while we agree that mere presence at the crime scene does not compel a conclusion that the defendant acted with reckless indifference (see, e.g., *People v. Ramirez* (2021) 71 Cal.App.5th 970, 975, 978, 989 [defendant who was present when accomplice shot victim did not act with reckless indifference]), Wallquist was not merely present during these events. He was violently active throughout them. He kicked in the apartment door, ordered victims at gunpoint out of a bedroom, and took property off the victims. Wallquist also described himself as desperate, saying he was hurting from his need for drugs. This evidence shows that he was not a passive participant or a mere get-away driver, removed from the events.

Wallquist counters that notwithstanding his presence when Odell shot Pedro, he had no meaningful opportunity to prevent the shooting because it was accidental. The trial court, however, did not find the shooting to be accidental.[5] And the limited

---

[5] Wallquist's assertion that Odell accidentally shot Pedro appears to come primarily from *Odell's* statement to detectives. The trial court did not consider Odell's statement at the evidentiary hearing, and no party urges that it should or could have considered that statement.

14

evidence before the trial court was sufficient to support a contrary conclusion. Although Wallquist told a detective that he thought it would be a "safe robbery," he and his accomplice armed themselves and forced their way into what they thought was a dope house where they knew people would be present. Importantly, Wallquist said that before Odell shot Pedro, Odell was acting crazy. However, Wallquist did not say he tried to restrain or calm Odell.

There was also evidence that Wallquist had the opportunity to restrain the crime. The crimes took place in an apartment, and although it is unclear how close Wallquist was to Odell, a reasonable inference is they were close to each other and to the victims throughout the events. Elodia testified that Wallquist was standing near her during crucial events. We therefore cannot find the evidence shows Wallquist lacked a meaningful opportunity to restrain Odell. (Compare *In re Loza* (2017) 10 Cal.App.5th 38, 51, 53 [petitioner had time to observe and react before murder because he heard killer threaten to shoot clerk and count to five before doing so]; with *In re Scoggins* (2020) 9 Cal.5th 667, 679 [quickness of shooting suggested defendant lacked control over accomplices' actions]; *In re Moore* (2021) 68 Cal.App.5th 434, 452 [defendant present during robbery but not " 'close enough' " to restrain shooter]; *People v. Ramirez, supra*, 71 Cal.App.5th at p. 989 [defendant lacked meaningful opportunity to intervene when he and shooter were on opposite sides of victim's car, and attempted carjacking was quickly executed].)

Wallquist's failure to aid the wounded Pedro also shows reckless indifference. (See, e.g., *Clark, supra*, 63 Cal.4th at p. 619; *In re Parrish* (2020) 58 Cal.App.5th 539, 544 [reckless indifference shown by failure to pause to aid or comfort victim];

15

*People v. Douglas* (2020) 56 Cal.App.5th 1, 10 [petitioner "displayed no interest in moderating violence or in aiding his bloody and suffering victim," and instead picked his pocket].) Indeed, there was evidence that Wallquist took Pedro's wallet from him after Odell shot him, which further supports the reckless indifference finding.

In sum, while Wallquist characterizes his crime as a " 'garden variety' armed robbery" which cannot support the reckless indifference finding, this phrase applies when "the only factor supporting reckless indifference to human life is the fact of the use of a gun." (*Clark*, *supra*, 63 Cal.4th at p. 617, fn. 74.) However, as we have shown, more than just that one factor establishes Wallquist's reckless indifference to human life.

IV.     Right to be present at section 1172.6, subdivision (d)(3) hearing

Wallquist contends that he had a constitutional right to be present at the evidentiary hearing.[6]  Without deciding the merits of the issue, we conclude that any error was harmless beyond a reasonable doubt.

*People v. Basler* (2022) 80 Cal.App.5th 46, 58 to 59, recently held that a petitioner has a right under the federal and California constitutions to be present at a section 1172.6, subdivision (d)(3) evidentiary hearing.  If a petitioner was not at the hearing, we ask whether his absence was harmless beyond a reasonable doubt, per *Chapman v. California* (1967) 386 U.S. 18, 24.

---

[6]     The minute order from the evidentiary hearing states that petitioner "waive[d] his appearance for today's proceedings."  The reporter's transcript, however, does not show that Wallquist waived his appearance, and it instead shows that his counsel said he was still in prison.

16

(*Basler*, at p. 59.)  The petitioner bears the burden of demonstrating that his absence resulted in prejudice or a denial of the right to a fair hearing.  (*Ibid.*)

On this record, any error in holding the hearing without Wallquist present was harmless beyond a reasonable doubt.  The only evidence considered at the hearing was the 1986 preliminary hearing transcript and Wallquist's statement to a detective given the same year, just after Pedro was murdered.  Wallquist does not identify any further testimony or evidence he could have presented at the hearing had he been present.  He merely states that his presence "could have altered the court's perception of appellant's version of the events."  It is unclear what he means by this.  It is further unclear what he could have offered evidence-wise to alter the trial court's understanding of the case, especially given that the crimes occurred about 33 years ago.

## DISPOSITION

The order denying Wallquist's Penal Code section 1172.6 petition is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

LAVIN, J.

EGERTON, J.

18